Agency. Mr. Hall, good morning. Good morning, Your Honor. May you please support me? My name is John Hall. I am a counsel for the City of Taunton, and I'd like to reserve two minutes for rebuttal. You may, before we proceed, however, both parties have received a copy of the order we issued this morning? Yes, Your Honor. Thank you. Could you lift the mic up a little bit, please? The City has documented a series of serious procedural and substantive errors occurring throughout the NPDES permit derivation process. Those include adding thousands of pages of new documents, supporting documents and analysis after the close of the public comment period, and not allowing any public comment on those key analyses, admittedly failing to analyze numerous factors that are relevant to setting defensible limits for nutrients in estuarine settings, and ignoring the submissions of the three key experts that reviewed NPDES methodology and each concluded it was irrational for setting the nutrient limit. With that said, I'd like to draw the Court's attention, however, to the new information that largely makes all of these arguments at this point somewhat after the fact. Is that information in the record? The new information? The new under the Clean Water Act can be brought to the Court's attention. It was also filed under the Court's authority for reviewing supplemental information. But it's not part of the administrative record that we're reviewing? Not part of the original administrative record, but under applicable administrative law and the provision of the Clean Water Act, information that was not available at the time of decision-making may be considered by the Court when it's clear that the new information shows the prior decision was in error, which was, in essence, the nature of the motion for moving the matter to the managing program for mediation, because the new information that EPA itself paid for to develop for the Narragansett Bay Estuary confirms that central factual conclusions that they used to issue the permit are clearly in error. And these are data that confirm this, so it's not an analysis, it's not something where you're saying your expert is claiming one thing, my expert is claiming another. It's the actual system data. Excuse me a minute, because I'm really not familiar with this maybe that I haven't had the right education, so maybe you can help me. How does it go about? Well, Your Honor, it's not frequently used provision of the Clean Water Act. In fact, I think one of the only other cases that we saw on this was a First Circuit case. It's Section 509C, which specifically states where there's information that was developed after decision-making, and it wasn't available at the time of decision. It would be brought to the attention of the court. The court can consider it and decide one of several factors. If the court decides it's substantial enough information, you can direct the parties to go back and brief with regard to that information. In other words, did it really change the facts and would I have reached a different conclusion? Or the court can direct some evidentiary analysis to be done on it to make sure that everybody understands what those new facts are, and then it can be considered. But, Your Honor, aren't you just describing one of the issues we have in this case? It is your contention that the EPA was required to supplement the record in light of material that you had submitted to them, and they say, no, we're not going to supplement the record, we're not going to reopen the record beyond the public comment period, either because the information you submitted was already available or because it does not raise any substantial new questions. So, again, you're just describing, I think, an issue that we have to decide in this case. Isn't that all that you're doing? Not exactly. No, Your Honor, that's not what we're doing. The issue on whether or not EPA should have considered the comments that came in after the end of the comment period because they kept offering new rationales for what they were doing, that was an issue with regard to the existing record, what was available at that time, did they change their decision making, did they add to it, and did they give the public an opportunity to comment on it, which is just a pretty straightforward procedural question on, hey, what would happen in any rulemaking, what would happen in permitting, where if there's a whole new analysis put in, is the public going to be allowed to comment on that new analysis the agency itself developed? That's one issue. The issue with regard to the new information showing that the basic conclusion the agency reached is unquestionably an error. I mean, I'll read you a quote. The commenters claim that the TN concentration in the Tonga River has decreased by 48 percent is simply untrue. It would not be predicted to be, and they're talking about the system improvements that occurred over time, which was a major issue that we appealed on, it would not be predicted to be sufficient to achieve the TN target or to achieve lower quality standards. Well, the data that the agency itself assisted in finding to be collected by the Narragansett Bay Program unequivocally confirms that all of Manahol, that Manahol Bay now meets the nitrogen target that they said we need to put all this treatment in to meet. But counsel, isn't this, I don't have the statutory permission in mind, but you are now pursuing a procedure which you are asking that that permit that they have now issued that it be amended. That's currently going on, and that is currently under consideration by EPA. Isn't that the same information that you would like to be addressed by the fur of the camp? It's the same information that's now before the agency in that permit modification procedure, is it not? Unquestionably, Your Honor. There's two vehicles that one can use. If suppose this is a permit appeal. In other words, this is an ongoing judicial review of the matter wherein such information could be considered, newer information. If you don't have an ongoing vehicle, the only vehicle you have to reopen a permit is to file a permit modification request, which, you know, the provisions of permit modification requests say no information not available at the time of permitting, and if you have that, you can seek a modification. But the Clean Water Act, under its judicial review provision, doesn't require, or rather allows, if there's an ongoing review of the matter, that the court can consider whether or not the new information, in fact, really changed the underlying assumptions. In other words, did you just make a mistake of fact? A simple one. I thought you were the person that committed the crime. No, we've got DNA evidence, it's that person, and it comes right in the middle of the trial. It's the same type of thing. That's what 509C says. It allows the appellate court to consider it if there's an ongoing matter, which this of course is. Was this fact finding? What you're asking is fact finding by an appellate court. I have to tell you, I've never heard of that. Well, Your Honor, the provision itself doesn't, it can allow for the court to order fact finding, it's on the face of the provision, that's what it says, or it can just ask the parties to submit supplemental briefing on that information to say whether or not, you know, you're asking the city of Toronto to spend $30 million on an extra level of nitrogen reduction at their plant. Do we actually have data now that shows that was a mistake? And it's not, we're not pointing fingers, it's not the agency's fault if new information arises after the fact and what they thought was the case earlier in fact isn't the case. Counsel, even if we were to go forward with the appeal as it is now positioned for us, even if we were to affirm the decision of the Environmental Appeal Board at EPA, you could still go forward with the permit modification procedure, and if it's successful in that procedure, it would have the effect of altering the decision that we would have affirmed in this decision, so you still have that avenue, the city still has that avenue of relief, does it not? An avenue exists to modify a permit. I would say as a legal point, it is a very different situation to have a fine, suppose this court ruled that the permit will file, and then that would put the city in potentially an ongoing violation of this provision, as opposed to the court allows in or considers the other information and says, no, you know, that answer was originally incorrect, you need to go back and refashion the permit to get the right answer. That puts the city in a very different legal position. How can we do that without inviting you to submit all of this new information that is not part of the record? We would have to supplement the existing record in a very large way in order to make the determination, well, maybe you're right, maybe all of this new information doesn't validate the decision that EPA has made, and so we want, we're going to send this back and order EPA to now consider all of this new information. That fundamentally changes the nature of the appeal before us. No, that's what supplementing the record allows a court to do, and that's what they're all procedures, there's a lot of cases where the new information comes out that indicates the prior decision was factually in error, the court may allow that in. In other words, you wouldn't normally... Can you cite any one case that says that? The Afghan case that we cited in the 509C motion, we also cited that line of cases, and I will get it back to you Ernest, I'll give you the precise, I don't want to guess how much pages it was and create any confusion. A couple more questions. A couple more questions. Oh yes, thank you. I would like to turn to your motion that we now, after our argument, send this to our camp officer for possible mediation. At the end of your motion, if I Even if that procedure was not successful, it did not lead to a negotiated settlement, I'm now reading from the very end of your motion, you say, if following those discussions with the camp program, EPA declines to amend any of its prior purling decisions or positions, the court can at that point decide the matter on the, this is a critical language, on the full updated record now before it, and thereby avoid the well-based concerned voice by the upper Blackstone panel. I gather it's your notion that if we were to order this procedure, and you could then present all this new information in the camp proceedings, that you would thereby have self-elected the record in the way that you're hoping to do it? Let me be a little more clear about the point I was making. The 509 procedure, 509C procedure, which we've already filed our motion on, allows that. If the agency, in fact, sits down and goes through all of this information and concludes, the Mt. Hope Bay data shows you're right, you're below the total nitrogen level, but we're still not going to consider that as relevant to changing your permit, the court could consider that agreed fact in deciding whether or not the agency's position is reasonable. I mean, that's allowable. If there was a complete disagreement of whether or not a fact even existed, certainly. I mean, that's a matter that would have to be reviewed or briefed separately under the 509 motion, but I would think that if we came to factual agreements on key issues, and there are three key factual points. We now apparently have agreement from the 509C motion that the core of the levels dropped significantly, that there was no argument that the DO didn't improve significantly, and we have the actual data from Mt. Hope Bay that shows it meets the number EPA said you had to meet. Those three facts underlie the whole case. But you were earlier raising that very issue in this appeal. I mean, one of the legal errors you argue is that in setting the effluent requirement for your client, they did not adequately consider all the improvements that have already taken place. And part of the problem was, Reiner, I think EPA was saying, I can decide whether or not they were cherry-picking some data. That's a different issue. But they were saying, we've looked at some of the data up to 2013, and we don't really think it shows any improvement occurred. Well, when the new Navigants at Bay report came out through 2015, that was a very different answer, and they were reviews on that report. So it would seem that the complete analysis of the system data, which was not done when they issued the permit, but which did happen with the more detailed report, now informs us what the actual reality is in the system. And why would we ignore that? Final question, if I might. The new information that you would hope to introduce before the camp mediator, is that the same information that's now before EPA in this permit modification procedure? It's the same information in the permit mod. It's the same information in the 501C motion. It's all the same information. That's it. Thank you. Thank you. Thank you. Ms. Buckley? Good morning, Your Honors. May it please the Court, Sarah Buckley on behalf of the Environmental Protection Agency. With me at Council table is Samir Bukhari of the Office of Regional Counsel at EPA Region 1. I'd like to refocus on the heart of this case for a moment. This case is about a 2015 final permit that imposed a nitrogen limit on the discharges that the city's wastewater treatment facility may discharge into the Taunton Estuary. The city is the second largest discharger of nitrogen in the Taunton Estuary, and EPA reasonably found that this permit limit was necessary to address the pressing water quality impairments that it observed in the Taunton Estuary and Mount Hope Bay. As this Court is familiar with from the Blackstone decision, nitrogen, while it's naturally present in water bodies at excessive levels, can fuel a process called cultural eutrophication, which is essentially a water body that suffocates itself through excess nitrogen more than it can assimilate. Both Massachusetts, where the city discharges, and Rhode Island, the downstream state, have found that every major discharger in the Taunton Estuary has accepted and is in the process of implementing nitrogen limits that are consistent with the analysis set out in this permit. In order to remedy the full problem, however, the city is going to have to do its fair share. Now at bottom, this is a simple case. EPA made a regulatory decision based on a logical series of scientific and technical judgments supported by an extensive record. This is a fair point. Information that was very critical to EPA's determination was actually quite old. The critical indicators report goes back to 2001. The so-called semast data goes back to 2004. It's not EPA's fault. You have to work, I guess, for the most part with the semast data, which was very important to the determinations of what would be the appropriate nitrogen level, what was the impaired condition of the relevant water body. That's all pretty old, is it not? So isn't there a fair criticism that you did not, and again, that they were trying to get before you what they regarded as more current data. Isn't that a fair criticism of what EPA did? Well, no, Your Honor. First, as this court recognized in Blackstone, there is always going to be a hope or anticipation of newer, better data. But so long as there's no reason to question the continuing validity of the data that's before it, EPA is entitled to rely on that. What about just the passage of time? Why doesn't that call into question the continuing validity of the data? Well, here we had corroborating data up through 2013 that continued to show, at a point in Mt. Hope Bay, high chlorophyll levels, low dissolved oxygen, and a pattern of those two parameters that indicated continuing cultural eutrophication. EPA also reviewed all of the supposed new data that the city presented during its comments, reviewed, for instance, dissolved oxygen data from Brayton Point that also showed that low dissolved oxygen levels persisted through 2013. And in general, there was no major change in the amount of nitrogen loading in the Taun Estuary that would suggest that a major change had taken place. Therefore, EPA was reasonable and entitled to continue to rely on that data and use its scientific judgment in assessing it. Now you have this claim that there is even newer data, which I gather is the subject of the permit modification, which is described as EPA's own data, or at least paid for by EPA, that shows significant improvement in the condition of the water bodies that are of concern here. Is that a fair characterization of the information they're trying to put before EPA? No, Your Honor, it's not a fair characterization. And as we pointed out in our response to their 509C, 1369C motion and their various motions to supplement the record here, on their face, these documents don't say what the city says they say. For one, the Narragansett Bay Estuary Program Report continues to show chlorophyll levels in Mount Hope Bay and other portions of the local indicators spectrum of what would be consistent with impaired conditions. Further, the bulk of what the city points to from the Narragansett Bay Estuary Program Report doesn't pertain to Mount Hope Bay and certainly doesn't address the Taun Estuary. If you take a look at their motions, some of the tables about the levels of chlorophyll, levels of dissolved oxygen, are all about different portions of Narragansett Bay that are east of Mount Hope Bay. And in any event, those tables continue to show that those portions of Narragansett Bay exceed chlorophyll levels and also do not meet the dissolved oxygen standards for Rhode Island or Massachusetts. So we would, one, disagree with the characterization and, two, disagree that these documents are properly before this Court at all. I'd like to address counsel's characterization of 1369C of the Clean Water Act, which I can read, states that in any judicial proceeding brought under subsection B, as this one is, in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, the Court may order additional evidence to be taken before the administrator, not by this Court. So for one, the 1369C makes clear that it applies to proceedings required to be made on the record after notice and opportunity for hearing. That is a common and well-known administrative law term of art for a formal adjudication. The NPDES permitting proceeding here was not a formal adjudication. In fact, this Court recognized in Dominion Energy Brayton Point that EPA's regulations making this permitting process an informal adjudication was acceptable under the Clean Water Act and upheld those regulations. So we are plainly not in the box where 1369C even applies as a legal matter. And further, the City's efforts to supplement the record with this information should be unavailing. This Court's precedence on record supplementation showed that the basis for supplementation is typically about what the record actually was that was before the agency, not whether there is new information that the agency should now consider to alter its decision. The Clean Water Act provides a mechanism for altering that decision through a modification proceedings and does not contemplate that either the Court through the petition for review process takes that evidence or that a permit proceeding need to remain open indefinitely to take new information. As this Court recognized in Blackstone, there is always going to be new information, but Congress knew that when it set a clear five-year permit cycle, which means that a permit will be continuously revisited and subsequent to oral argument, I gather, did direct that there be a mediation effort. That's noted in the decision. It probably took place over about a period of six months and then the Court was notified that that was not successful when the Court went on to make its decision on the basis of the existing record. Since the Court did that in Blackstone, why shouldn't we do it here? Well, here I think the context of Blackstone is important in that the mediation was not successful. And what was different in that case is that the discharger had a model that we have different situation where this record is right for judicial review and the only basis for decision about this permit is that record. Many of the issues that have now been raised in a modification, which I will note was not supplemented until March 28th or 29th of this year with this supposed new information, the city has put that information before the Court and has unfortunately put EPA in a difficult position. And if we were referred to mediation, that difficulty would only be exacerbated. It would interject the Court and the mediation into this separate administrative process where there are competing values about openness versus confidentiality. Typically the modification proceeding would be subject to FOIA, both state and federal, but under the mediation program, typically we would have the benefit of that in this case that would help significantly narrow the issues for discussion. The parties have had What do you mean by that? As part of this permit modification procedure? Is that what you're referring to? When you say narrow the issues, for what purpose? Yes, Your Honor. The parties have had fundamental disagreements on many of the issues, including what standard to apply here. The city has advocated a standard of causation that we think is not supported by the regulations. Well, that seems to be a settled issue. Blackstone settled that issue. Well, I would absolutely agree with that, Your Honor, but this remains some of the disagreements between us. Moreover, if we were able to narrow the field of issues and we could focus in on an agreed method of negotiation that the city would like to present. I gather that we could decide this case and then the permit modification procedure... Say we were to decide this case in favor of EPA, the permit modification procedure could go forward and then EPA would decide, well, there is all this new information and we should, yeah, we should modify the permit. What would be the point of our effort to resolve this appeal only to find that, in short order, the permit that's been the subject of so much contention gets modified? What would have been the point of all that effort on our part? Well, it promotes the values of consistency and finality in the permitting process, which Congress envisioned when it established the five-year permit revision and renewal. Moreover, again, some of the issues that the city continues to advocate here, both in its merits brief and in the motions that remain pending before the court, are tied up in issues that the city would like considered in the modification proceeding. And I will note that the city's nitrogen limit is subject to a ten-year compliance schedule and we are not yet to the end of year two in that compliance schedule, and therefore there is time in that should modifications need to happen before the city would need to expend excessive amounts of money. So what, final question, so what your comment suggests is that the city is now, despite dependency of this appeal, is required to comply with the permit? Yes, Your Honor, at the beginning of this petition, the city filed a motion to stay the permit terms. The city also filed that motion in the administrative proceedings. We opposed and the motions panel denied that motion. And so all of the millions of dollars of expenditures that are required to achieve compliance, those are already being expended? Not quite, Your Honor. In year two of the compliance schedule, I believe the city need only finish its planning process. By the end of year three, the city finishes the design process. Year five, the city must comply with the interim limit and need not comply with the 3.0 milligram per liter limit. So large expenditures are in the future then, is that correct? That's right. All right, thank you. Thank you. Your Honor, if I could just make a couple brief points in rebuttal. The factual situation we have right now is far more compelling than what occurred in Upper Blackstone. They simply had a model in that case that they thought would show less reduction is required. The actual data in the system confirm that the number that EPA said that was necessary to protect the system from nutrients is met. That's a big difference. And so if we were to go into the management program, the CAM program, I don't think we would feel compelled to sit there and argue with EPA over whether or not their .45 number for the purposes of that discussion is incorrect because it's met. So it's the number that they said needed to be met. And what that does is then changes all the calculations of what Thornton needs to do to contribute, to continue to meet that number. So it's a very different situation. Secondly, the statement about the EPA need a series of logical, technical judgments. I mean, they expressly said they did not consider the factors to show whether or not nitrogen was really causing the problem, and they had no responsibility to do it. That's right in response to comments. Then they said the data that they used allowed them to predict what nitrogen number would meet the DO standard. And then later on in response to comments said the data can't be used to develop a relationship between nitrogen, chlorophyll-A, and DO. I would suggest that these are like completely irrational positions. You can't claim the data is perfectly good for one thing and then say, but it's not acceptable for proving the opposite is occurring. With regard to the upper Blackstone case, I would draw the court's attention. The court did a very careful analysis of what EPA did to prove what they were doing was reasonable. They used a peer-reviewed model. We don't have a peer-reviewed model. The model was in national guidance. Ours isn't. They carefully compared the model results to the actual data in the system. They never did that here. They concluded the basic causal relationships in the Merrill model correspond to what's actually occurring. Our data showed the opposite, which is why they didn't do the analysis. And they fully accounted for the model's shortcomings in the draft permit. That was the underlying kerfuffle, if you will, over the draft permit that was issued when we said there's no backup analysis saying how can you claim that just doing A will cause B? Where's the backup analysis? Where's the model's shortcomings? It did not exist in the record when the city provided its comments. And thank you. Thank you. We should talk about maybe, after I've brought you to a point. Okay. Thank you. Thank you. Thank you.